**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STEPHEN T. MCPHERSON,<br><br>        Plaintiff,<br><br>        v.<br><br>THOMAS W. HARKER, *in his official capacity as Acting Secretary of the Navy*, et al.,<br><br>        Defendants. | Civil Action No. 18-cv-3082 (BAH)<br><br>Chief Judge Beryl A. Howell |

**<u>MEMORANDUM OPINION</u>**

In 2012, plaintiff Stephen McPherson's career as a Naval officer was derailed when he was found to have engaged in an inappropriately flirtatious relationship with the wife of a subordinate enlisted servicemember, a Chief Petty Officer in the same Navy command as plaintiff. The relationship was discovered when the subordinate, suspecting his wife of having an affair, found her Facebook messages with plaintiff and forwarded them to his chain of command. Following an investigation and hearing, the Navy imposed nonjudicial punishment ("NJP"), consisting of a $2,000 pay forfeiture and a letter of reprimand submitted to plaintiff's military personnel file, accompanied by a determination that separation was not required. Plaintiff's subsequent petition to the Board for Correction of Naval Records ("the Board"), a civilian review body, to have the letter of reprimand removed from his file, due to alleged illegality in use of the flirtatious Facebook messages and other procedural errors in the NJP proceedings, was denied. Meanwhile, plaintiff had twice been passed over for promotion to Lieutenant Commander, based on his misconduct with the subordinate's wife, as memorialized

1

in the letter of reprimand in his military personnel file, resulting in his mandatory involuntary discharge from the Navy.

Plaintiff now seeks review, pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, and via a cross-motion for summary judgment, of the Board's decision not to expunge the reprimand letter from his file.  Defendants, the Acting Secretary of the Navy, the U.S. Navy, and the Board, urge in their motion for summary judgment that the Board's decision be upheld.  For the reasons set out below, defendants' motion for summary judgment is granted and plaintiff's cross-motion for summary judgment is denied.

## I.      BACKGROUND

A brief overview of the facts giving rise to the instant lawsuit is followed by discussion of the almost decade-long procedural history of administrative adjudications, including the Board decision that is the focus of plaintiff's challenge.

### A.      Factual Background

Plaintiff joined the U.S. Navy in 2004 as a Naval Aviator, a commissioned officer, and initially enjoyed a promising career trajectory, receiving top-ranking performance evaluations. Am. Compl. ¶¶ 7–8, 10, ECF No. 9.  On August 1, 2011, plaintiff, by then a Lieutenant, was assigned to work as a Staff Action Protocol Officer for the Chief of Naval Forces Europe, Chief of Naval Forces Africa, Commander Sixth Fleet, *id.* ¶ 11, where he occupied an office adjacent to Nicole Thomas, who was a civilian Navy employee, *id.* ¶ 12; Admin. Record ("AR") at 56, ECF No. 21, and the spouse of a Chief Petty Officer junior in rank to plaintiff.  AR at 131.  This Chief Petty Officer was, like plaintiff, a member of the Sixth Fleet command, although plaintiff was not in his direct chain of command.  *See id.* at 131, 198.  According to plaintiff, Mrs. Thomas "pursued [him]" romantically.  Am. Compl. ¶ 12.  Although plaintiff suggests that the

relationship was thus one-sided, he nevertheless exchanged mutually flirtatious messages with Mrs. Thomas on Facebook.  *See* AR at 2.

In January 2012, Mrs. Thomas's spouse attempted to log into her Facebook account after noticing suspicious items in the search history of their shared home computer, but was unable to do so because he did not have the correct password for the account.  *Id.* at 78.  Without Mrs. Thomas's permission, her spouse initiated a password change email using their shared email account that was associated with Mrs. Thomas's Facebook account.  *Id.*  He then used that password change email to reset her Facebook password, log into the account, and download Mrs. Thomas's private Facebook messages with plaintiff.  *See id.*  Mrs. Thomas's spouse reported to his chain of command that plaintiff was having an affair with Mrs. Thomas and "provided parts of [Mrs. Thomas's] Facebook profile to his chain of command."  Am. Compl. ¶ 43; *see also* AR at 59.

### B.     Procedural Background

Plaintiff's involvement with the Chief Petty Officer's spouse sparked a lengthy series of interrelated administrative actions, which are described chronologically.

#### 1.     *Plaintiff's NJP Proceedings*

In response to the Chief Petty Officer's report, the Navy conducted an investigation into the allegations that plaintiff was having an affair with a subordinate's spouse.  AR at 2.  On January 25, 2012, the Navy issued a Report of Preliminary Inquiry, which determined that plaintiff had "engaged in inappropriate and flirtatious behavior" with the "wife . . . of an enlisted member of [his] command."  *Id.*  On February 1, 2012, plaintiff was notified by the Staff Judge Advocate that he was being investigated for violation of the Uniform Code of Military Justice ("UCMJ"), Am. Compl. ¶ 13, and was subsequently "removed from [his] office, reassigned outside the command, and ordered not to have contact or communication with [Mrs. Thomas]."

AR at 2.  On February 15, 2012, plaintiff was informed that the Navy intended to pursue NJP to address his potential misconduct with Mrs. Thomas.  *Id.* at 28.[1]

On February 16, 2012, one day after plaintiff was notified that "he needed to decide between NJP or court-martial," *id.* at 53, NJP proceedings were conducted before Rear Admiral Kenneth Norton ("RADM Norton") and the Staff Judge Advocate, *id.* at 28, on charges that plaintiff violated Articles 133 ("Conduct unbecoming an officer and gentleman") and 134 ("General article") of the UCMJ, for "engag[ing] in an inappropriate and unduly familiar relationship involving online chats and physical contact (i.e., kissing and touching), with Mrs. Nicole Thomas, the wife of a Chief Petty Officer assigned to his command," *id.* at 149.  During the NJP proceedings, plaintiff "apologized for any part [he] had in letting [his] friendship with Ms. Thomas go too far."  *Id.* at 28.  In response to RADM Norton's query whether plaintiff had any witnesses to call, plaintiff indicated he had one witness, but after further discussion with RADM Norton, plaintiff declined to call her, purportedly out of concern that her job security would be negatively affected by her testifying at the NJP proceedings.  *See id.* at 29.  RADM Norton found that plaintiff had violated UCMJ Articles 133 and 134 and imposed NJP consisting of a Punitive Letter of Reprimand ("PLOR") and forfeiture of $1,000 of his monthly pay for two months, for a total of a $2,000 fine.  *Id.* at 139.

Around the time of plaintiff's NJP proceedings, he twice signed a Report and Disposition of Offense(s) ("Report") memorializing the NJP proceedings and the punishment imposed.  *Id.* at

---

[1]     As defendants explain, NJP is an informal administrative punishment that "[c]ommanders may impose . . . for acts or omissions that are minor offenses under the punitive articles of the UCMJ."  In many circumstances, including plaintiff's, a servicemember facing NJP may opt instead to face trial by court-martial, and "[w]hen an accused elects NJP in lieu of a court-martial, he benefits from the relative informality of NJP proceedings and the lessened severity of the potential punishments."  Defs.' Mem. Supp. Mot. Summ. J. at 10, ECF No. 13-1; *see also* 10 U.S.C. § 815(b) (authorizing commanding officers to impose, for "minor offenses [and] without the intervention of a court-martial," certain non-judicial punishments, including, *inter alia,* arrest in quarters or correctional facility, suspension from duty for up to thirty days, imposition of half pay for up to two months, or extra duties for up to forty-five days); *infra* Part III.B.2.

2.  He signed the Report, on February 16, 2012, the date of the NJP proceedings, acknowledging that he had the right to demand trial by court-martial in lieu of NJP, *id.*, and again, on March 8, 2012, twenty days after NJP was imposed, but on a different line corresponding to a different section of the Report acknowledging that he had been informed of the nature of the accusations against him, that he did not have to make a statement, and that any statement he did make could be used against him, *id.*  Plaintiff alleges that when he signed the report the second time, on March 8, 2012, he was asked to backdate his signature to February 16, 2012, but refused to do so.  *Id.*; Am. Compl. ¶ 56.

### 2.   *Plaintiff's NJP Appeal and Punitive Letter of Reprimand*

On March 9, 2012, plaintiff submitted an appeal to RADM Norton of his decision to impose NJP, pursuant to 10 U.S.C. § 815(e).  Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' Mem.") at 4, ECF No. 13-1; *see also* AR at 141–43.  In his appeal, plaintiff challenged only the $2,000 fine that he was issued as part of his NJP, arguing that "the punishment was unjust and disproportionate to the offense," but not otherwise challenging the finding of misconduct or alleging any procedural defects in the NJP proceedings.  AR at 141.  He admitted that "inappropriate language" with Ms. Thomas was "mutual[] and reciprocated," and although he claimed that it "was initiated by" Ms. Thomas, *id.* at 142, he "sincerely apologize[d] to anyone for any errors [he had] made, or if any of [his] conduct caused offense," *id.* at 141.  Plaintiff further explained that his intent at the NJP proceedings had been to "apologize for flirtatious posts with Mrs. Thomas as well as for allowing a friendship to grow too close."  *Id.*

Norton found that plaintiff "admitted guilt to two specifications involving an unduly familiar relationship with the spouse of a Chief Petty Officer assigned to his command," and that "[t]he results of the NJP were neither unjust nor disproportionate."  *Id.* at 151.  He nevertheless

decided to suspend plaintiff's $2,000 pay forfeiture, on the condition he not engage in misconduct for six months, *see id.*, although he found that "[t]he remaining punishment, a Punitive Letter of Reprimand, is wholly appropriate under these circumstances," *id.*

With plaintiff's appeal resolved, his PLOR was issued on April 2, 2012, and plaintiff acknowledged its receipt on April 4, 2012.  *Id.* at 2–3.  The PLOR explained plaintiff's misconduct and also noted that the NJP hearing had been conducted after plaintiff was "appraised of [his] rights . . . to refuse [NJP] and demand trial by court-martial," and that plaintiff's admissions to the misconduct with Mrs. Thomas were made "after being apprised of [his] right against self-incrimination."  *Id.* at 3 (second alteration in original).  On May 23, 2012, a report on plaintiff's NJP and PLOR was submitted for inclusion in his official military personnel file ("OMPF").  *Id.*  Plaintiff was afforded an opportunity to submit a statement on the adverse report, but he did not do so.  *Id.*

Plaintiff's subsequent performance evaluation, or fitness report ("FITREP"), for the period February 1, 2012 to March 23, 2012, noted the NJP.  *Id.*  Plaintiff was afforded an opportunity to acknowledge the FITREP and submit a statement and, after he did neither, the FITREP was submitted for inclusion in plaintiff's OMPF.  *Id.*  On April 3, 2012, plaintiff was selected for the eligibility list for promotion to Lieutenant Commander, but on July 17, 2012, the promotion consideration was withheld pending review of the misconduct that formed the basis of plaintiff's NJP.  *Id.*  In response, plaintiff submitted a statement expressing "deep regret" for his conduct with Mrs. Thomas and "taking full responsibility for [his] actions."  *Id.*

### 3.   *Plaintiff's Board of Inquiry Proceeding*

On November 13, 2012, plaintiff was notified that a Board of Inquiry ("BOI") would be convened, based on his misconduct with Mrs. Thomas, to determine whether he should be

retained in the Navy.  Defs.' Mem. at 4; AR at 13.  Plaintiff submitted a letter to the BOI

requesting that the Facebook messages obtained by Mrs. Thomas's husband not be considered in

deciding whether he would be retained in the Navy, arguing that they were illegally obtained in

violation of the Wiretap Act, 18 U.S.C. §§ 2510 *et seq.*  AR at 78–83.  The BOI considered live

testimony and written statements, including from Mrs. Thomas, who testified that she and

plaintiff "both will admit [their] mistake in that [they] got too flirty, and exchanged messages

with sexual innuendos and double entendres," and that "[t]hese things escalated, and in a few

conversations, . . . [they] ended up escalating things for shock value and to see how far such

flirting would go." *Id.* at 175.  On February 14, 2013, the BOI determined, by a unanimous 3-0

vote, that plaintiff violated UCMJ Articles 133 and 134 stemming from his "inappropriate and

unduly familiar relationship" with Ms. Thomas.  *Id.* at 139, 155–56.  The BOI recommended,

however, "by a vote of two to one[,] that [plaintiff] be retained in the naval service," *id.* at 155,

with one dissenting member of the view that plaintiff lacked the "moral capacity" for continued

service, *id.* at 158.

While the BOI proceedings were ongoing, plaintiff was again selected for consideration

for promotion to Lieutenant Commander.  Defs.' Mem. at 5.  On January 1, 2014, however, the

Chief of Naval Operations recommended against promoting plaintiff, based on his misconduct

with Mrs. Thomas.  AR at 139–40.  The Secretary of the Navy acted on this recommendation

and, in May 2014, declined to promote plaintiff because his "conduct with the spouse of a chief

petty officer was contrary to accepted standards of personal conduct for a naval officer."  AR at

4, 140.

### 4.    *Plaintiff's Petition to the Board and Discharge from the Navy*

On September 16, 2014, plaintiff petitioned the Board to correct his naval records, pursuant to 10 U.S.C. § 1552, seeking "expungement" of his PLOR from his OMPF and the promotion that he did not receive in May 2014.  AR at 133.[2]  In support of his petition, plaintiff alleged that (1) Mrs. Thomas had sexually harassed him, (2) Mrs. Thomas's husband obtained and reported the Facebook messages to Navy leadership because plaintiff and plaintiff's wife would not engage in "a multi-partner sexual relationship"; (3) plaintiff was subjected to a hostile work environment caused by Mrs. Thomas's repeated attempts to contact him; (4) insufficient evidence was presented at the NJP hearing to support a finding that plaintiff had violated the UCMJ; (5) plaintiff was not apprised of his NJP rights and did not sign an acknowledgement of those rights prior to his NJP; and (6) the Facebook messages had been obtained in violation of the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701 *et seq.*  AR at 131–33.

On September 16, 2015, the Board denied plaintiff's petition.  *See id.* at 115–16.  The Board informed plaintiff that "[a]fter careful and conscientious consideration of the entire record, [it] found the evidence submitted was insufficient to establish the existence of probable material error or injustice."  *Id.* at 115.  The Board rejected plaintiff's contention that he and Mrs. Thomas had a "purely platonic relationship," citing Mrs. Thomas's "own statement, [which] . . . referenced that . . . both [she and plaintiff] crossed the line and had physical contact, and [plaintiff himself] had owned up to both the physical and flirtatious behavior."  *Id.*  The Board also "carefully weighed all potentially mitigating factors, such as [plaintiff's] period of

---

[2]     The Board is a civilian review body empowered, acting on behalf of the Secretary of the Navy, to "correct any military record . . . when . . . necessary to correct an error or remove an injustice."  *Roberts v. United States*, 741 F.3d 152, 158 (D.C. Cir. 2014) (quoting 10 U.S.C. § 1552(a)(1)).  "The person seeking to correct a record must provide 'substantial evidence' in order to overcome the Board's presumption that 'public officers,' including military officers, 'have properly discharged their official duties.'"  *Id.* (quoting 32 C.F.R. § 723.3(e)(2)).  "The Board may deny an application 'if it determines that the evidence of record fails to demonstrate the existence of probable material error or injustice.'"  *Id.* (quoting 32 C.F.R. § 723.3(e)(2)).

satisfactory service and assertion that [he] did not commit any misconduct." *Id.* at 116.

"Nevertheless, the Board concluded that these factors were not sufficient to remove the punitive

letter of reprimand" from plaintiff's OMPF, "or have [his] promotion . . . reinstated." *Id.*

Accordingly, plaintiff's application was denied. *Id.*

Meanwhile, on May 18, 2015, while plaintiff's Board petition was still under

consideration and before the Board reached its decision, plaintiff was again considered for

promotion to Lieutenant Commander, and again, in October 2015, was not selected. *Id.* at 4.

After twice failing to be selected for a given promotion—a circumstance requiring separation

from active duty—plaintiff was involuntarily discharged from the Navy, pursuant to 10 U.S.C. §

632, on March 31, 2016. *Id.*

### 5.   *The Instant Lawsuit and the Board's February 2020 Decision on Remand*

Plaintiff commenced the instant lawsuit on December 26, 2018, seeking review of the

Board's September 2015 decision, under the APA. *See* Compl., ECF No. 1. Specifically,

plaintiff contended that he had not been properly advised of his rights at the NJP and that the

Navy had impermissibly relied on plaintiff's communications with Mrs. Thomas in the NJP

proceedings, all of which errors rendered the Board's decision not to correct his Naval records

arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, and otherwise

unlawful. *Id.* ¶¶ 38, 41. On March 4, 2019, before defendants filed an answer, the parties jointly

requested that the matter be remanded to the Board, in order to address plaintiff's arguments that

his messages with Mrs. Thomas constituted unlawfully obtained evidence, *see* Joint Mot. for

Voluntary Remand & Stay of Proceedings, ECF No. 5, which motion was granted, *see* Min.

Order (Mar. 5, 2019).

On remand, plaintiff renewed his argument that his social media messages with Mrs. Thomas used against him in the NJP proceedings had been obtained in violation of the Wiretap Act and the SCA, and that the consideration of those messages in the NJP proceedings constituted probable material error warranting revocation of his NJP and removal of the PLOR from his OMPF.  *See* AR at 4.  Plaintiff sought reinstatement into the Navy, a promotion to Lieutenant Commander, and removal of the February–March 2012 FITREP referencing his misconduct with Mrs. Thomas.  *Id.*

On February 18, 2020, the Board issued its decision on remand.  Joint Status Report at 1, ECF No. 8.  The Board rejected plaintiff's SCA argument, reasoning that the Act protects "information that an internet or e-mail provider stores to its servers, information stored with a telephone company, and information maintained by an electronic bulletin board operator—*if such information is stored temporarily pending delivery* or for purposes of backup protection." AR at 4–5 (emphasis in original).  Since "there is no evidence in the record, and [plaintiff] provided none, that would indicate the information that [Mrs. Thomas's husband] accessed was 'stored temporarily pending delivery,'" the Board determined that "the SCA does not apply to the circumstances of [plaintiff's] case."  *Id.* at 5.  Instead, the Board determined that "only a properly raised claim under the Fourth Amendment could possibly provide a remedy for a violation of [plaintiff's] rights."  *Id.*[3]

---

[3]      The Board further rejected the possibility that the Fourth Amendment applied to her husband's unauthorized access to Mrs. Thomas's emails or social media messages, based on the private search doctrine, which "reflects the well-established principle that the Fourth Amendment, and its case-law-derived search and seizure rules, do not apply to searches conducted by private parties."  AR at 5.  As such, the Board reasoned, "[i]n order to run afoul of the Fourth Amendment, . . . the Government must do more than passively accept or acquiesce in a private party's search efforts," and instead, to establish a Fourth Amendment violation, plaintiff needed to show that "the private individual intended to assist law enforcement" rather than harboring "some other independent motivation."  *Id.*  Plaintiff, however, had "failed to show that [Mrs. Thomas's husband] was acting in anything other than his own personal capacity," and in fact, "[t]he record shows that he had an 'independent motivation' to investigate 'romantic phrases' from internet searches on the iPad he shared with his wife, and there is no evidence that the Navy or any official instructed [the husband] to conduct these services."  *Id.*  As such, "the Fourth

The Board also rejected plaintiff's argument that Mrs. Thomas's husband's acquisition of his wife's Facebook messages violated the Wiretap Act. *See id.* The Board reasoned that he had not "intercepted" his wife's Facebook messages, as proscribed by the Wiretap Act, because "the act of 'intercepting' must be contemporaneous with the communication, and the Board found no evidence that [Mrs. Thomas's husband] had e-mails on 'auto-forward' or installed any programs to contemporaneously intercept the e-mails messages at the same time they were sent." *Id.*[4]

Next, the Board addressed plaintiff's host of procedural objections to his NJP, including that he was not advised of the charges against him or his right to proceed via court-martial instead of NJP, he was not asked to enter a plea to the charges against him, the NJP was conducted only one day after he was told he needed to decide between a court-martial and an NJP, giving him insufficient time to prepare, and the commander conducting the NJP proceedings showed "blatant contempt" for plaintiff's requests to call witnesses and be accompanied by counsel. *Id.* at 6.

The Board agreed with plaintiff that the record reflected that he "did not acknowledge all of [his] rights *in writing* until" March 8, 2021, twenty days after the NJP hearing was conducted on February 16, 2021. *Id.* (emphasis in original). The Board nevertheless determined that his "untimely written acknowledgement . . . of [plaintiff's] procedural rights d[id] not constitute probable material error or injustice warranting removal of the NJP from [his] record," as the Board found that plaintiff was advised of his rights "prior to the imposition of the NJP" even

---

Amendment [did] not apply to [the husband's] unauthorized access and disclosure of the private messages to the" Navy. *Id.* Plaintiff does not argue in the instant lawsuit that the Facebook messages were obtained in violation of the Fourth Amendment or that the Board erred in concluding that the Fourth Amendment did not apply to Mrs. Thomas's husband's acquisition of the Facebook messages at issue.

[4]   Further, the Board found substantial evidence supporting the finding of plaintiff's misconduct other than the objected-to Facebook messages, pointing to plaintiff's admission to the misconduct, including his statement in his NJP appeal that he "allow[ed] a friendship to grow too close" and used "inappropriate language" in communicating with Mrs. Thomas. AR at 7.

though his written acknowledgement did not occur until March 8, 2012. *Id.* Plaintiff's own allegation that he received only one day's notice about "need[ing] to decide between NJP or court-martial" was cited by the Board as indicating that he must have been aware of his right to proceed via court-martial instead of via NJP. *Id.* The Board also noted that plaintiff had an opportunity to challenge the validity of the NJP based on this alleged procedural violation on March 8, 2012, when he eventually signed the Report, and yet made no challenge. *Id.* Then, when he appealed the NJP, he "did not allege any violations of [his] NJP rights or [his] right to due process, and . . . did not identify any prejudice resulting from [his] later memorialized written acknowledgment of [his] rights at NJP," instead arguing only that the penalty [reduction in salary] was disproportionate to his offense. *Id.* at 7. Further, plaintiff's PLOR "clearly reference[d] that [he] was apprised of [his] rights prior to the imposition of NJP," yet plaintiff "elected not to submit a statement disputing this fact or any of the claims made in the PLOR" even though he had been provided an opportunity to do so. *Id.* at 6. Finally, the Board observed that plaintiff is "a law school graduate and [was] an attorney before [he] entered the Navy," further undermining his claim that he was unaware of his right to a court-martial. *Id.* Considering this evidence together, in particular plaintiff's repeated failure to object to statements memorializing that plaintiff had been advised of his rights, the Board determined that plaintiff had in fact been so advised. *See id.*

The Board also rejected plaintiff's arguments that he had not been asked to enter a plea and that he was given only a day's notice to decide between proceeding via court-martial or NJP, as no law or regulation either required that plaintiff enter a plea or imposed a waiting period before an NJP could be imposed. *Id.* at 8. Finally, the Board rejected plaintiff's argument that he had been "dissuaded" from calling witnesses in his defense or being accompanied by counsel,

since the record contained no evidence that plaintiff in fact asked or sought to call witnesses or be accompanied by counsel, and thus no evidence that any such requests were denied. *Id.*

In sum, then, the Board determined that plaintiff had "not overcome the presumption of regularity with substantial evidence to the contrary," and therefore had "not shown any probable material error or injustice in [his] record." *Id.* Accordingly, the Board again denied plaintiff's petition. *Id.*

### 6.    *Plaintiff's Operative Amended Complaint*

On May 12, 2020, plaintiff filed an amended complaint, requesting judicial review of the Board's February 2020 decision. *See* Am. Compl. He seeks a determination that the Board's February 2020 decision is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law, or unsupported by substantial evidence, and an order "direct[ing] the Defendant to reinstate Plaintiff to military service (with any associated back pay and allowances)," in addition to attorney's fees and litigation costs. *Id.* at 18–19. As grounds for this relief, plaintiff argues both that the Board incorrectly determined that RADM Norton permissibly considered plaintiff's Facebook messages with Mrs. Thomas, and that the Board erred in rejecting his various procedural objections to the NJP hearing, including that he was not advised of his rights to demand trial by court-martial in lieu of NJP and to remain silent; was not asked to enter a plea at the outset of the NJP proceedings; was given only one day's notice that he needed to decide between court-martial and NJP; and was dissuaded by RADM Norton from presenting his own witnesses and being accompanied by counsel. *Id.* ¶¶ 50, 52.

The parties subsequently cross-moved for summary judgment. *See* Defs.' Mot. Summ. J., ECF No. 13; Pl.'s Cross-Mot. Summ. J., ECF No. 16. Those motions have been fully briefed, *see* Defs.' Mem.; Pl.'s Opp'n Defs.' Mot. Summ. J. & Mem. Supp. Cross-Mot. Summ. J. ("Pl.'s

Opp'n."), ECF No. 15; Defs.' Reply Supp. Mot. Summ. J. & Opp'n Pl.'s Cross-Mot. Summ. J. ("Defs.' Reply"), ECF No. 18; Pl.'s Reply Supp. Cross.-Mot. Summ. J. ("Pl.'s Reply"), ECF No. 20, and are now ripe for resolution.

## II.     LEGAL STANDARD

### A.       Administrative Procedure Act

The APA provides for judicial review of any "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and "instructs a reviewing court to set aside agency action found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,'" *Cigar Ass'n of Am. v. FDA*, 964 F.3d 56, 61 (D.C. Cir. 2020) (quoting 5 U.S.C. § 706(2)(A)).  This standard "'requires agencies to engage in reasoned decisionmaking,' and . . . to reasonably explain to reviewing courts the bases for the actions they take and the conclusions they reach." *Brotherhood of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 115 (D.C. Cir. 2020) (quoting *Dep't of Homeland Sec. v. Regents of Univ. of Cal.* ("*Regents*"), 140 S. Ct. 1891, 1905 (2020)).  An agency's factual findings are reviewed for substantial evidence, *see* 5 U.S.C. § 706(2)(E), "meaning that [the court] 'determine[s] whether there is such relevant evidence as a reasonable mind might accept as adequate to support the [agency's] conclusion,'" *Am. Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 796 F.3d 18, 23 (D.C. Cir. 2015) (quoting *Jim Walter Res., Inc. v. Sec'y of Labor*, 103 F.3d 1020, 1023–24 (D.C. Cir. 1997)); *see also Bistek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." (alteration in original) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938))).  Judicial review of agency action is limited to "'the grounds that the agency invoked when it took the action,'" *Regents*, 140 S. Ct. at 1907 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)),

and the agency, too, "must defend its actions based on the reasons it gave when it acted," *id.* at 1909.

### B.    Summary Judgment

Under Federal Rule of Civil Procedure 56, "'[a] party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law.'" *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006)); *see also* Fed. R. Civ. P. 56(a).  In APA cases such as this one, involving cross-motions for summary judgment, "the district judge sits as an appellate tribunal.  The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote omitted) (collecting cases); *see also, e.g.*, *Lubow v. U.S. Dep't of State*, 923 F. Supp. 2d 28, 34, (D.D.C. 2013) ("Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.").  Thus, this Court need not and ought not engage in lengthy fact finding, since "[g]enerally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996); *see also Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 171 (D.C. Cir. 2013) (noting, in an APA case, that "determining the facts is generally the agency's responsibility, not ours").  Judicial review is limited to the administrative record, since "[i]t is black-letter administrative law that in an [APA] case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision." *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (second alteration in original) (internal quotation omitted).

### C.      Judicial Review of Board Decisions

Courts "review[] the decisions of boards for correction of military records 'in light of familiar principles of administrative law.'" *Piersall v. Winter*, 435 F.3d 319, 322 (D.C. Cir. 2006) (quoting *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1511 (D.C. Cir. 1989)); *see also Chappel v. Wallace*, 462 U.S. 296, 303–04 (1983) (stating that decisions of the Board are "subject to judicial review and can be set aside if they are arbitrary, capricious, or not based on substantial evidence."). Such review is limited, however, by the "fundamental and highly salutary principle" that "[j]udges are not given the task of running the [military]," *Piersall*, 435 F.3d at 322 (alterations in original) (quoting *Kreis*, 866 F.2d at 1511); *see also Kreis*, 866 F.2d at 1511 ("The Constitution vests '[t]he complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force' exclusively in the legislative and executive branches." (alteration in original) (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973))). Accordingly, courts lack subject-matter jurisdiction to review "military personnel decisions," such as requests from servicemembers for promotion or reinstatement, as "[t]o grant such relief would require [courts] to second-guess the Secretary[] [of the Navy's] decision about how best to allocate military personnel in order to serve the security needs of the Nation," a "task inherently unsuitable to the judicial branch." *Kreis*, 866 F.2d at 1511; *see also Brannum v. Lake*, 311 F.3d 1127, 1131 (D.C. Cir. 2002) (holding that courts are prohibited from directly reviewing decision to impose NJP); *McKinney v. White*, 291 F.3d 851, 854 (D.C. Cir. 2002) (holding that courts lack jurisdiction to "review direct appeal[]" from court-martial conviction).

A servicemember's "more modest request" for a "district court merely to evaluate, in light of familiar principles of administrative law, the reasonableness of the Secretary's decision not to take certain corrective action with respect to [plaintiff's] record," however, is justiciable. *Kreis*, 866 F.2d at 1511; *see also Piersall*, 435 F.3d at 323–24 (reaffirming "the well-settled rule

that the decisions of boards for correction of military records are subject to review under the APA"). "Adjudication of [such] claims requires the district court to determine only whether the [Board's] decision making process was deficient, not whether his decision was correct." *Kreis*, 866 F.2d at 1511; *see also id.* at 1512 (noting that review of Board's decision "looks like nothing more than the normal review of agency action, in which [courts] require only that the agency exercise its discretion in a reasoned manner").

Judicial "scrupulous[ness] not to interfere with legitimate [military] matters," *id.* at 1511 (quoting *Orloff v. Willoughby*, 345 U.S. 83, 93–94 (1953)), further dictates that, although courts have jurisdiction to review a Board decision pursuant to familiar APA standards, the deference ordinarily owed to an agency's substantive decisionmaking and fact finding is heightened when doing so. "[J]udicial review in this context involves 'an unusually deferential application of the "arbitrary or capricious" standard' of the APA," *Piersall*, 435 F.3d at 324 (quoting *Kreis*, 866 F.2d at 1514); *see also Gillan v. Winter*, 474 F.3d 813, 817 (D.C. Cir. 2007) (citing *Cone v. Caldera*, 223 F.3d 789, 793 (D.C. Cir. 2000)), which requires only that defendants "show that the [Board's] decision contains a 'rational connection between the facts found and the choice made.'" *Gillan*, 474 F.3d at 819 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## III.   DISCUSSION

Plaintiff mounts two challenges to the Board's February 2020 decision. First, he claims the Board erred in rejecting his argument that RADM Norton should not have considered his Facebook messages with Mrs. Thomas in imposing NJP because those communications were unlawfully obtained. Second, he contends that a bevy of procedural protections were violated

during his NJP proceedings.  These objections are considered in turn, following analysis of the

Court's jurisdiction to entertain the instant lawsuit, and both fail.

> **A.      The Court's Jurisdiction over the Instant Lawsuit**

At the outset, the Court must consider whether it has jurisdiction over plaintiff's lawsuit,

a question the parties failed to address.  *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)

("[C]ourts . . . have an independent obligation to determine whether subject-matter jurisdiction

exists, even in the absence of a challenge from any party.").  As noted, one remedy that plaintiff

seeks in the instant lawsuit is an order "direct[ing] the [Navy] to reinstate Plaintiff to military

service (with any associated back pay and allowances)."  Am. Compl. at 19.  Like the *Kreis*

plaintiff's request "for retroactive promotion," plaintiff's request that he be reinstated "falls

squarely within the realm of nonjusticiable military personnel decisions," as granting plaintiff's

requested "relief would require [the Court] to second-guess the Secretary [of the Navy's]

decision about how best to allocate military personnel in order to serve the security needs of the

Nation."  *Kreis*, 866 F.2d at 1511.

The justiciability of the instant lawsuit is saved, however, by plaintiff's request, as an

alternative remedy, that the Court determine the Board's February 2020 decision is arbitrary,

capricious, an abuse of discretion, otherwise not in accordance with the law, or unsupported by

substantial evidence, and remand the matter to the Board for further proceedings.  *See* Am.

Compl. at 14.  Such review is "nothing more than the normal review of agency action," *Kreis*,

866 F.2d at 1512, and therefore within the scope of the Court's subject-matter jurisdiction.  *See*

*id.* at 1511–12 (holding that court has jurisdiction to consider plaintiff's request that the court

"evaluate, in light of familiar principles of administrative law, the reasonableness of the

Secretary's not to take certain corrective action with respect to [plaintiff's] record," even when

plaintiff's lawsuit was also "aimed ultimately at securing his promotion").

Having established subject matter jurisdiction over the instant lawsuit, plaintiff's challenges to the Board's February 2020 decision are considered next.

### B.      Plaintiff's Challenge to Use of Facebook Messages in NJP Proceedings

Plaintiff first contends that "[t]he investigation against him was born out of illegally obtained communications," Am. Compl. ¶ 50 because (1) his Facebook messages with Mrs. Thomas were "illegally obtained" by her husband, in violation of the Wiretap Act and the SCA; (2) the Navy was proscribed from relying on such illegally obtained communications during his NJP proceedings; and (3) the Board erred, as a matter of law, in concluding that reliance on these communications during plaintiff's NJP proceedings was permissible, *id.* ¶¶ 43–46.  This argument falls flat, for two reasons.  First, the statutes that plaintiff invokes themselves preclude the remedy that he seeks, namely exclusion of the Facebook messages from his NJP proceedings.  Second, the Military Rules of Evidence and governing military regulations permit the consideration of these messages.

### 1.      *Neither the Wiretap Act nor the SCA Requires or Supports Exclusion of the Facebook Messages*

Plaintiff misconstrues the applicability and relevance of the Wiretap Act and the SCA to the instant lawsuit, as explained below.

#### a)      *Wiretap Act*

First, the Wiretap Act, which subjects to criminal penalties or, in some circumstances, civil suit, any person who, *inter alia*, "intentionally intercepts . . . any wire, oral, or electronic communication," 18 U.S.C. § 2511(1)(a), or "intentionally discloses . . . to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication," *id.* § 2511(1)(c), is inapplicable to Mrs. Thomas's husband's actions in

obtaining the Facebook messages between his wife and plaintiff.  The proscribed

"intercept[ion]," statutorily defined as "the aural or other acquisition of the contents of any wire,

electronic, or oral communication through the use of any electronic, mechanical, or other

device," *id.* § 2510(4), must be contemporaneous with the communication's transmission.  *See*

*Council on Am.-Islamic Relations Action Network v. Gaubatz*, 793 F. Supp. 2d 311, 329 (D.D.C.

2011); *see also, e.g.*, Orin S. Kerr, *A User's Guide to the Stored Communications Act, and a*

*Legislator's Guide to Amending It*, 72 GEO. WASH. L. REV. 1208, 1231 (2004) ("[T]he Wiretap

Act . . . protects contents of communications in transit. . . . [A]n e-mail message will be protected

by the Wiretap Act when in transit, but by the SCA when it is stored." (footnote omitted) (citing

U.S. DEP'T OF JUSTICE, SEARCHING AND SEIZING COMPUTERS AND OBTAINING ELECTRONIC

EVIDENCE IN CRIMINAL INVESTIGATIONS § IV.B (1st ed. 2002)); U.S. DEP'T OF JUSTICE,

SEARCHING AND SEIZING COMPUTERS AND OBTAINING ELECTRONIC EVIDENCE IN CRIMINAL

INVESTIGATIONS 165 (3d ed. 2015) ("The structure and language of the SCA . . . require[s] that

the term 'intercept' be applied only to communications acquired contemporaneously with their

transmission. . . . An individual who obtains access to a stored copy of the communication does

not 'intercept' the communication."); *Intercept*, MERRIAM-WEBSTER ONLINE,

https://www.merriam-webster.com/dictionary/intercept ("to stop, seize, or interrupt in progress

or course or before arrival").[5]  Mrs. Thomas's husband retrieved her Facebook messages with

plaintiff only after transmission was completed and thus did not contemporaneously intercept

them.  Accordingly, no violation of the Wiretap Act occurred.

---

[5]     The D.C. Circuit has not addressed whether the interception of a communication must be contemporaneous to fall within the scope of the Wiretap Act, but every other circuit court of appeals to have considered the issue has uniformly held that interception must be contemporaneous.  *See Boudrea v. Lussier*, 901 F.3d 65, 77–78 (1st Cir. 2018); *Luis v. Zang*, 833 F.3d 619, 627, 630–31 (6th Cir. 2016); *Fraser v. Nationwide Mutual Ins. Co.*, 352 F.3d 107, 113 (3d Cir. 2003); *United States v. Steiger*, 318 F.3d 1039, 1047 (11th Cir. 2003); *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002); *Steve Jackson Games, Inc. v. U.S. Secret Serv.*, 36 F.3d 457, 460–61 (5th Cir. 1994).

Attempting to resist this conclusion, plaintiff contends that the relevant intercepted communication was not any of the Facebook messages that plaintiff and Mrs. Thomas exchanged but rather the Facebook password reset email that Mrs. Thomas's husband triggered when he reset his wife's Facebook password.  *See* Pl.'s Opp'n at 6.  According to plaintiff, "Facebook sent the email to Mrs. Thomas, and [her husband] contemporaneously intercepted it," *id.*, which in turn permitted her husband "to gain access to the correspondence between Mrs. Thomas and" plaintiff, *id.* at 7.  This argument fails, however, because Mrs. Thomas's husband did not "intercept" that email.  Rather, the record reflects that the password reset email was sent to an email address that Mrs. Thomas and her husband shared.  AR at 78.  Thus, Mrs. Thomas's husband was an intended recipient of the email, as he had control of and authorized access to the email account to which it was sent, and therefore did not intercept it.

b)      *Stored Communications Act*

The SCA proscribes, *inter alia*, "intentionally access[ing] without authorization a facility through which an electronic communication service is provided . . . and thereby obtain[ing], alter[ing], or prevent[ing] authorized access to a wire or electronic communication while it is in electronic storage in such system."  18 U.S.C. § 2701(a).  Unlike the Wiretap Act, Mrs. Thomas's husband may have violated the SCA, as he "intentionally access[ed]" Facebook's servers, by logging into his wife's account without her permission, in order to "obtain[] . . . a[n] electronic communication," namely the Facebook messages between Mrs. Thomas and plaintiff, in "electronic storage" on those servers.  *Id.*; *see also Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 879–80 (9th Cir. 2002) (assuming, for purposes of determining whether SCA exception applied, that unauthorized access to private messages on social media websites violates § 2701(a)(1) of SCA); *Ehling v. Monmouth-Ocean Hosp. Serv. Corp.*, 961 F. Supp. 2d 659, 667–

69 (D.N.J. 2013) (holding that semi-public Facebook "wall posts" are protected from disclosure by § 2701 of SCA); *Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 980–81 (C.D. Cal. 2010) (holding that private Facebook messages, like those at issue here, are electronic communication services and therefore may not be voluntarily disclosed by Facebook, pursuant to § 2702(a)(1), (b) of SCA). Although Mrs. Thomas's husband's *access* to the Facebook servers to retrieve her private messages may have been unlawful, his *disclosure* of those messages to his chain of command was not. *See* 18 U.S.C. § 2701(a) (prohibiting only access to electronically stored communications); *see also Wesley College v. Pitts*, 974 F. Supp. 375, 389 (D. Del. 1997) ("[A] person who does not provide an electronic communication service . . . can disclose or use with impunity the contents of an electronic communication unlawfully obtained from electronic storage.").[6]

---

[6] Unlike § 2701 of the SCA, the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, forbids not only unauthorized access to certain electronic contents but also, in some circumstances, disclosure of such unlawfully accessed material. *See id.* § 1030(a)(1) (prohibiting any person from knowingly accessing "information that has been determined by the United States Government . . . to require protection against unauthorized disclosure for reasons of national defense or foreign relations" and from "willfully communicat[ing], deliver[ing], transmit[ting] . . . the same [information] to any person not entitled to receive it."); *id.* § 1030(a)(2))(C), (e)(2) (prohibiting "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] . . . information from any . . . computer" that is used in or affects interstate commerce). Courts have held that a person "exceeds authorized access" and therefore violates § 1030(a)(2) by disclosing without authorization information obtained from a computer to which the person had authorized access. *See, e.g.*, *EF Cultural Travel BV v. Explorica*, 274 F.3d 577, 582–83 (1st Cir. 2001) (holding that defendant exceeded authorized access within meaning of § 1030(a)(2) by disclosing computer data that it was permitted to access but forbidden, by confidentiality agreement, to disclose); *see also United States v. John*, 597 F.3d 263, 272 (5th Cir. 2010) ("Access to a computer and data that can be obtained from that access may be exceeded if the purposes for which the access has been given are exceeded.").

The Board in its February 2020 decision noted that during plaintiff's BOI proceedings, he argued that his Facebook messages were obtained in violation of both the Wiretap Act and § 1030(a)(2) of the CFAA, but no reference to the CFAA appears in the administrative record of the BOI proceedings, which instead reflects that plaintiff argued to the BOI only that those messages had been obtained in violation of the Wiretap Act. *See* AR at 76–86. In any event, assuming that plaintiff did contend before the BOI that Mrs. Thomas's husband violated § 1030(a)(2) of the CFAA, he has long since abandoned that argument, as he did not renew it either in his Board proceedings or before this Court. Plaintiff's abandonment of this contention was prudent, as the CFAA likely does not apply to Mrs. Thomas's husband's conduct. As explained, the Facebook messages at issue were obtained from Facebook's servers, and, accordingly, were not "obtain[ed] . . . from a[] . . . computer," *id.* § 1030(a)(2)(C). Indeed, plaintiff concedes as much when he argues that Mrs. Thomas's husband did "not . . . illegal[ly] access . . . a home computer" but rather "illegal[ly] access[ed] . . . stored communications protected by the SCA that were stored on Facebook's server," Pl.'s Opp'n at 7.

Further, the SCA does not authorize the exclusionary remedy plaintiff seeks to enforce here. Rather, the SCA provides that a person who violates the Act is subject to criminal penalties consisting of a fine or up to a year imprisonment, 18 U.S.C. § 2701(b), or a civil action for an injunction or other equitable relief or to recover damages, *id.* § 2707(a)–(b). Notably, those "remedies and sanctions . . . are the only judicial remedies and sanctions for nonconstitutional violations of" the SCA. *Id.* § 2708 (entitled "Exclusivity of remedies"). Thus, the SCA forecloses the relief plaintiff seeks for Mrs. Thomas's husband's alleged violation of the Act, namely, exclusion of his wife's Facebooks messages with plaintiff from plaintiff's NJP proceedings.

### 2. *The Military Rules of Evidence Exclusionary Rule Is Inapplicable in NJP Proceedings*

Regulations governing plaintiff's NJP proceedings likewise did not authorize the exclusionary remedy plaintiff seeks but rather permitted RADM Norton to consider plaintiff's Facebook messages with Mrs. Thomas. The UCMJ provides "four levels of punishment proceedings—NJP, summary court-martial, special court-martial, and general court-martial— gradually progressing upward in both procedural protections and possible punishments." *Turner v. Dep't of Navy*, 325 F.3d 310, 314 (D.C. Cir. 2003). NJP is an "administrative method of dealing with the most minor offenses," *Middendorf v. Henry*, 425 U.S. 25, 32–32 (1976); *see also* JOINT SERVICE COMM. ON MILITARY JUSTICE, MANUAL FOR COURTS-MARTIAL UNITED STATES ("Manual for Courts-Martial"), Part V, ¶ 1.b (2012) ("Nonjudicial punishment is a disciplinary measure more serious than . . . administrative corrective measures . . . but less serious than trial by court-martial."), and "provides commanders with an essential and prompt means of maintaining good order and discipline[,] and also promotes positive behavior changes in Servicemembers without the stigma of a court-martial conviction," Manual for Courts-Martial,

23

Part V, ¶ 1.c; *see also Turner*, 425 F.3d at 318–19 (Tatel, J., concurring) (noting that purpose of NJP is "to help service members avoid the stigma of court-martial convictions while allowing military commanders to act quickly to preserve order and morale"); *Sasen v. Spencer*, 879 F.3d 354, 361 (1st Cir. 2018) (noting that NJP is "meant to ensure order and good behavior within the armed forces" but "is not a criminal proceeding").[7]  In contrast, trial by court-martial is ordinarily reserved for more serious offenses and can result in severe punishment, *see Middendorf*, 425 U.S. at 31–32, although a servicemember facing NJP may elect instead to proceed via court-martial, *see supra* note 1; Manual for Courts-Martial, Part V, ¶ 3 ("Except in the case of a person attached to or embarked in a vessel, [NJP] may not be imposed . . . upon any member of the armed forced who has, before the imposition of [NJP], demanded trial by court-martial in lieu of [NJP]").  Commanders have broad latitude to impose NJP, *see generally* Manual for Courts-Martial, Part V, ¶ 1, and any appeal from or later review of NJP is considered and decided deferentially, *see, e.g.*, *id.* ¶ 1.i ("Failure to comply with any of the procedural provisions [governing NJP] . . . shall not invalidate a punishment . . . , unless the error materially prejudiced a substantial right of the Servicemember . . . .").

Reflecting the difference in formality between NJP and court-martial proceedings, the latter includes procedural protections not provided in the former.  Salient here, the Military Rules of Evidence provide for the exclusion of certain unlawfully obtained evidence from court-martial proceedings.  *See generally* Manual for Courts-Martial, Part III, § 3 (reproducing the Military Rules of Evidence).  For instance, an involuntary incriminating statement "is inadmissible at trial" by court-martial.  Military R. Evid. 304(a); *see also* 10 U.S.C. § 831(a), (d) (providing that

---

[7]      The Manual for Courts Martial has been updated as recently as 2019.  *See* JOINT SERVICE COMM. ON MILITARY JUSTICE, MANUAL FOR COURTS-MARTIAL UNITED STATES (2019).  The 2012 edition was in effect at the time of plaintiff's NJP proceedings.

a servicemember may not be "compel[led] . . . to incriminate himself or to answer any question the answer to which may tend to incriminate him" and that "[n]o statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial").  Similarly, "[e]vidence obtained as a result of an unlawful search or seizure made by a person acting in a governmental capacity is inadmissible against the accused" in a court-martial proceeding if the accused timely files to suppress the evidence and had a reasonable expectation of privacy in the evidence seized.  Military R. Evid. 311(a).

Plaintiff attempts to import such procedural protections applicable in court-martial proceedings into his NJP proceedings. Crucially, however, regulations governing NJP proceedings expressly provide that "[t]he Military Rules of Evidence . . . , other than with respect to privileges, do not apply at nonjudicial punishment proceedings."  Manual for Courts-Martial, Part V, ¶ 4.c.3.  Consistent with this clear statement, courts to have considered the issue have concluded that the exclusionary remedy does not apply in NJP proceedings or, more generally, outside of court-martial proceedings.  *See Sasen*, 879 F.3d at 360 ("[T]he exclusionary remedy sought by the [plaintiff] is not available in non-judicial punishment proceedings."); *Scarselli v. United States*, No. 17-507C, 2020 WL 1670705, at *9 (Fed. Ct. Cl. Apr. 3, 2020) ("[Boards of Inquiry] are not courts-martial and the rules of evidence do not apply." (internal quotation marks omitted)); *Kindred v. United States*, 41 Fed. Cl. 106, 112 (1998) (holding that exclusionary remedy of Article 31(d) of UCMJ, 10 U.S.C. § 831(d), does not apply outside court-martial context). Thus, the exclusionary remedy that plaintiff seeks to have applied to his NJP proceedings is reserved for trial by court-martial, and so RADM Norton's consideration of plaintiff's Facebook messages with Mrs. Thomas was permissible.

Furthermore, even if the Military Rules of Evidence did apply in plaintiff's NJP proceedings, they would nevertheless not have proscribed consideration of plaintiff's Facebook messages with Mrs. Thomas.  The Military Rules of Evidence provide that "[e]vidence obtained as a result of an unlawful search or seizure *made by a person acting in a governmental capacity* is inadmissible against the accused in court-martial proceedings."  Military R. Evid. 311(a) (emphasis added).  Here, no evidence suggests that Mrs. Thomas's husband was acting "in a governmental capacity" when he accessed his wife's Facebook messages.  To the contrary, the record indicates that Mrs. Thomas's husband accessed her messages in his personal capacity as a husband suspicious of his spouse's infidelity.  *See* AR at 78 (explaining that Mrs. Thomas's husband attempted to log in to his wife's Facebook account after he "noticed some odd searches in the search history" of their shared computer, "which pertained to romance and romantic phrases," and "he was confused at the nature of these searches").  Indeed, the role of the Navy itself in the acquisition of the messages was wholly passive and unknowing, as it did not receive or even become aware of those messages until they were forwarded, unsolicited, by Mrs. Thomas's husband.  Accordingly, plaintiff concedes, as he must, that the exclusionary rule proscribing consideration of unlawfully obtained evidence does not apply to NJP proceedings. *See* Pl.'s Opp'n at 12 (acknowledging "[t]he common practice of not utilizing the particular evidentiary rules during informal hearings such as the NJP" and "the lack of formal evidentiary standards" at NJP proceedings).

Plaintiff nevertheless contends that the fact that the exclusionary remedy does not apply to NJP proceedings "holds no weight with the issue at hand," Pl.'s Opp'n at 12, citing as support *McVeigh v. Cohen*, 983 F. Supp. 215 (D.D.C. 1998).  *McVeigh* does not support plaintiff's position, however.  That case involved a challenge to the Navy's compliance with the military's

"Don't Ask, Don't Tell" policy after it investigated plaintiff's sexual orientation by requesting

from AOL information associated with an anonymous email account believed to be plaintiff's.

To be sure, the challenged Navy action in *McVeigh* was a so-called "administrative separation,"

983 F. Supp. at 217, not a court-martial, and the court in *McVeigh* stated that the actions taken by

the Navy to ferret out details of plaintiff's personal life, upon which it then relied in plaintiff's

administrative separation proceedings, were "likely illegal under the Electronic Communications

Privacy Act of 1986 ('ECPA'), " *id.* at 219.  Yet this observation was not essential to the court's

holding, which was that "the Navy violated its own regulations" when it took

"affirmative[] . . . steps" to confirm personal details concerning plaintiff.  *Id.*; *see also id.* at 218

("At its core, the Plaintiff's complaint is with the Navy's compliance, or lack thereof, with its

new regulations under the 'Don't Ask, Don't Tell, Don't Pursue' policy."); *id.* at 221 ("[T]he

case will be able to be disposed on the basis of the 'Don't Ask, Don't Tell, Don't Pursue'

policy.").  Moreover, the court in *McVeigh* appears not to have considered, and the Navy appears

not to have argued, whether the evidence allegedly gathered in violation of ECPA was

nevertheless properly considered in plaintiff's administrative separation proceedings in light of

the inapplicability of the Military Rules of Evidence exclusionary rule.  Finally, in *McVeigh*, the

evidence at issue was sought and obtained by the Navy itself in the course of its official

investigation into plaintiff's sexual orientation, *see id.* at 217, unlike here, where, as explained,

plaintiff's Facebook messages with Mrs. Thomas were obtained by her husband acting in a

personal, rather than official, capacity, and forwarded, unsolicited, to the Navy without any

official request from the Navy.

Accordingly, the Navy was not prohibited from considering these Facebook messages in

imposing plaintiff's NJP, and the Board did not err in rejecting plaintiff's argument to the

contrary. Plaintiff has failed to show that the Board acted arbitrarily and capriciously, and this objection to the Board's February 2020 decision therefore provide no basis for his requested remand of the matter to the Board.

### C.    Plaintiff's Procedural Challenges to His NJP

Plaintiff next argues that, even putting aside the allegation that his messages with Mrs. Thomas should not have been considered during his NJP proceedings, "the injustice against him spread to the denial of basic procedural rights leading up to and during the NJP proceeding." Am. Compl. ¶ 50. According to plaintiff, those proceedings violated "the Navy's own policies and procedures governing non-judicial punishment," *id.* ¶ 54, by (1) not affording him his right, pursuant to Article 31(b) of the UCMJ, to be "inform[ed] . . . of the nature of the accusation [against him] and advis[ed] . . . that he does not have to make any statement," *id.* ¶ 55 (quoting 10 U.S.C. § 831(b)); (2) conducting the NJP proceedings only one day after plaintiff was informed he needed to decide between NJP and court-martial proceedings, *id.* ¶ 52; (3) "dissuad[ing] [him] from calling witnesses or being accompanied by counsel," *id.*; and (4) not affording him an opportunity to enter a plea, *id.* ¶ 56. In addition to these procedural objections to his NJP proceedings, plaintiff also argues that (5) the Board "fail[ed] to properly evaluate the full record," Pl.'s Opp'n at 11. He seeks a remand to the Board to reconsider these challenges. *See* Am. Compl. at 10, 18–19. These arguments are addressed in turn, and none is persuasive.

### 1.    *The Board's Finding that, Before His NJP Proceedings, Plaintiff Was Notified of His Rights to Court-Martial and Against Self-Incrimination*

Before imposing NJP, the Navy was required to inform plaintiff of his right to forgo NJP and demand trial by court-martial, Manual for Courts-Martial, Part V, ¶ 4.a.5, and his right against self-incrimination, *id.* ¶ 4.c.1.A; *see also* 10 U.S.C. § 831. Plaintiff contends that he was

not provided such notice, and that the Board's finding to the contrary was unsupported by substantial evidence.

As explained, *see supra* Part I.B.5, the Board considered and rejected plaintiff's argument that he was not advised of these rights in advance of his NJP proceedings.  While recognizing that plaintiff "did not acknowledge all of [his] rights *in writing* until" March 8, 2012, the Board found that he had been verbally advised of those rights before the NJP proceedings.  AR at 6 (emphasis in original).  Contrary to plaintiff's insistence that the Board's determination that he was advised of his rights is "pure speculation," Pl.'s Opp'n at 12, this finding is supported by substantial evidence in the record, *see Kreis*, 866 F.2d at 1512 (citing *Chappell*, 462 U.S. at 303).

As the Board reasoned in its February 2020 decision, "on numerous occasions, [plaintiff] had the opportunity to challenge the validity of [his] NJP based on alleged violations of [his] rights, but [he] failed to do so."  AR at 7.  The PLOR that was submitted to plaintiff's file expressly notes that his "NJP hearing was conducted *after [plaintiff] was 'apprised of [his] rights*, pursuant to [the UCMJ], to refuse [NJP] and demand trial by court-martial,' and that [plaintiff] made admissions 'after being apprised of [his] right against self-incrimination.'"  *Id.* at 1 (emphasis added).  As the Board found, plaintiff was provided the opportunity to submit a response to the PLOR, including the PLOR's statements that he was advised of his rights before the NJP proceedings, *id.*, but instead plaintiff submitted a statement only that he "d[id] not intend to submit a statement," *id.* at 153.  He was afforded an additional opportunity to argue that he had not been advised of his rights when he appealed his NJP, but he again failed to do so, as "the gravamen of [his] . . . NJP appeal was that the forfeitures awarded were disproportionate to [his] offense."  *Id.* at 7.  Nor did plaintiff argue that his NJP proceedings had been infected with procedural violations, including that he had not been advised of his rights, when he was informed

that his promotion eligibility was being suspended pending a BOI proceeding regarding his misconduct with Mrs. Thomas.  *See id.*  In light of plaintiff's repeated failures to object or even suggest that he had not been advised of these rights before his NJP hearing, even given "numerous opportunities in which one might reasonably have been expected to raise such a claim," *id.*, the Board found that he had in fact been advised of those rights, notwithstanding that he did not acknowledge those rights *in writing* until twenty days after the NJP proceedings had concluded.[8]  This factual determination, for which the Board is entitled to broad deference, *see Piersall*, 435 F.3d at 211; *Gillan*, 474 F.3d at 817, 819, was supported by substantial evidence.[9]

---

[8]     Defendants offer a further reason that the Board did not err in determining that plaintiff was advised of his rights, notwithstanding that his written acknowledgement of such occurred twenty days after his NJP.  As noted, plaintiff twice signed the Report memorializing his offense and the NJP disposition.  The first signature, executed on February 16, 2012, the day of the NJP proceedings, acknowledged that he had the right to demand trial by court-martial in lieu of NJP.  AR at 2.  Twenty days later, on March 8, 2012, he signed a different line on the same page of the Report, this signature acknowledging that he had been informed of the nature of the accusations against him and that he did not have to make a statement, and that any statement he made could be used against him.  *See id.* (noting that on March 8, 2012, plaintiff signed the Report, for the second time, "in the section immediately preceding and . . . right above [his] 16 February 2012 signature").  Defendants suggest that "[i]t is hardly 'speculation' to conclude that Plaintiff received the entire document when he signed the document" the first time, on February 16.  Defs.' Reply at 11.  Although this logic might have bolstered the Board's factual determination that defendant had been verbally advised of his rights prior to the NJP proceedings, this reason was not provided or relied upon by the Board in its February 2020 decision and therefore will not be considered.  *See Regents*, 140 S. Ct. at 1907.

[9]     Furthermore, even if plaintiff were correct that he had not been advised of these rights, he has failed to demonstrate that he was prejudiced by such supposed error.  *See* 5 U.S.C. § 706 (flush text) ("[T]he court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."); *Shinseki v. Sanders*, 556 U.S. 396, 409 (holding that this statutory language "requires [the court] to apply [in review of Board decisions] the same kind of 'harmless-error' rule that courts ordinarily apply in civil cases"); *id.* at 409 ("[T]he party that 'seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted." (quoting *Palmer v. Hoffman*, 318 U.S. 109, 116 (1943)))).  In other words, plaintiff must "explain[] how he would have acted differently" had the alleged error not occurred.  *Shinseki*, 556 U.S. at 403.  Plaintiff has not done so.  Instead, plaintiff argues only that this supposed error qualifies as inherently prejudicial without any further showing, stating that "had the [Navy] not made the error[], the Plaintiff would have been able to keep his job."  Pl.'s Opp'n at 14; *see also* Pl.'s Reply at 9 ("Failure to advise somebody of their rights to ensure that they make an informed decision about how they should proceed is an inherently harmful action.").  This position, however, is squarely foreclosed by Supreme Court precedent.  *See Shinseki*, 556 U.S. at 403, 405 (rejecting argument that agency's failure to provide required notice is presumptively prejudicial and "has the 'natural effect' of producing prejudice" (quoting *Mayfield v. Nicholson*, 19 Vet. App. 103, 120–24 (2005)))).

2.     *Plaintiff's Remaining Procedural Objections*

Plaintiff's remaining arguments concerning the Board's analysis of his procedural objections to his NJP proceedings, *see* Am. Compl. ¶¶ 52, 56, may be readily dispatched, as the Board's treatment of each of those arguments was not arbitrary or capricious and was supported by substantial evidence, and in fact plaintiff largely does not argue otherwise.  First, plaintiff objects that his NJP proceedings were conducted just one day after he was informed that he needed to choose between NJP and court-martial proceedings, such that he had only one day's advance notice of the proceedings.  As the Board noted, however, the Navy was not required to provide any amount of advance notice of the impending NJP proceedings.  AR at 8.  A servicemember facing possible NJP must be notified of that fact, *see* Manual for Courts-Martial, Part V, ¶ 4.a, but conspicuously absent from that governing regulation is any requirement that the notice must be provided at a certain time in advance of the proceedings, *see id.*

Second, the Board likewise rejected plaintiff's argument that he was not afforded an opportunity to enter a plea, as "nothing in law or regulation requires the entry of pleas at NJP." AR at 8.  Although a servicemember must be afforded an opportunity to enter a plea at the outset of court-martial proceedings, *see* Manual for Courts-Martial, Part II, ch. 9, at II-117–20, no such requirement exists for NJP proceedings, *see id.*, Part V, ¶ 4(a).

Third, the Board rejected plaintiff's contention that he was dissuaded from calling witnesses or being accompanied by counsel.  Although an accused in NJP proceedings is entitled to be accompanied by a "spokesperson," *id.* ¶ 4.c.1.B, and to have "reasonably available" witnesses present, *id.* ¶ 4.c.1.F, the Board found that plaintiff had not in fact even "requested witnesses or to be accompanied by counsel," and therefore could not show "that such requests were denied," AR at 8.  In reaching this conclusion, the Board considered, but was "not

31

persuaded" by, plaintiff's evidence, "including [his] affidavit and the second-hand account of [his potential] witness," that his "decision not to call witnesses or be accompanied by counsel was involuntary." *Id.* This credibility determination by the Board is accorded the same deference that is owed its other factual determinations, *see, e.g.*, *Sokol v. United States*, 120 Fed. Cl. 144, 155 (2015) (citing *Stine v. United States*, 92 Fed. Cl. 776, 796 (2010)), and even more so on this issue, considering that plaintiff advances no argument as to how the Board erred in this analysis.

Finally, although plaintiff's Amended Complaint provides no obvious basis for this claim, he devotes much of his summary judgment briefing to disputing the Board's factual finding that he was involved in a "romantic relationship" with Mrs. Thomas. Pl.'s Reply at 2–6; *see also* Pl.'s Opp'n at 9–11. He argues that the Board "attempt[ed] to take statements made by the Plaintiff out of context and apply a meaning that was not at all intended," Pl.'s Opp'n at 9, contending that, during his NJP proceedings, although he "generally apologized for any errors he made," he "specifically stated that a *friendship* had grown too close," not "that the relationship with Mrs. Thomas was romantic in nature." *Id.* at 10 (emphasis in original); *see also* Pl.'s Reply at 3. He further suggests that his "statement that the friendship had 'gone too far' was a reference to the friendship with [Mrs. Thomas] evolving into something obsessive, not romantic," Pl.'s Reply at 4, the blame for which development, according to plaintiff, is attributable to Mrs. Thomas, *see id.* at 3–4.

This argument is wholly uncompelling, for two reasons. First, plaintiff mischaracterizes the Board's factual finding. It never concluded that he had a "romantic relationship" with Mrs. Thomas, but rather determined that "during the period from November 2011 to January 2012, [plaintiff] and [Mrs. Thomas] engaged in inappropriate and flirtatious behavior and

e-mail/Facebook . . . message exchanges," AR at 2, and that in the course of the NJP

proceedings, plaintiff was found to have "engaged in an unduly familiar relationship . . . with the

wife of a fellow sailor," *id.*  Thus, plaintiff objects to a finding that the Board never actually

made.  Second, and more importantly, although plaintiff attempts to frame this objection as an

argument that the Board "fail[ed] to properly evaluate the full record," Pl.'s Opp'n at 11, in

reality it amounts to no more than a disagreement with the substance  of the Board's factual

findings based on its review of the record.  Indeed, plaintiff admits as much when he states that

he "does not deny certain events or conversations, but [rather] . . . rejects the [Board's] incorrect

interpretation" of those events.  Pl.'s Opp'n at 11.  Thus, plaintiff's contention that the Board

"potential[ly] misinterpret[ed]" his statements and messages with Mrs. Thomas, *id.* at 10, runs

afoul of the bedrock principle that "when reviewing an agency determination for substantial

evidence the question is not whether the challenger's construction is plausible but whether the

record can support the agency's conclusion," *Am. Coal Co.*, 796 F.3d at 30 (citing *Fla. Gas

Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010)).  Here, the record plainly

supports the Board's finding that plaintiff "engaged in inappropriate and flirtatious behavior"

with Mrs. Thomas.  AR at 2; *see also supra* Part I.B.1–.3.  In arguing to the contrary, plaintiff

asks the Court "to substitute its judgment for that of the" Board, which the Court may not do,

*State Farm*, 463 U.S. at 43; *see also Kreis*, 866 F.2d at 1511 (holding that APA review of

Board's decision permits "determin[ation] only [of] whether the [Board's] decision making

process was deficient, not whether [its] decision was correct").

## IV.     CONCLUSION

For the foregoing reasons, the Board's February 2020 decision was not arbitrary and

capricious and was supported by substantial evidence.  Plaintiff's reliance on the Wiretap Act,

the SCA, and the Military Rules of Evidence as a source of error in the Board's reasoning is

misplaced since none of those sources forbade consideration, during plaintiff's NJP proceedings,

of his Facebook messages with Mrs. Thomas, and in fact regulations governing NJP permitted

such consideration.  The Board likewise did not err in rejecting plaintiff's procedural objections

to his NJP proceedings, as its findings that (1) plaintiff was advised of his rights in advance of

those proceedings, (2) was not denied his rights to a spokesperson or to call witnesses, and (3)

engaged in an inappropriate relationship with Mrs. Thomas were supported by substantial

evidence, and plaintiff's remaining procedural objections have no basis in the law governing NJP

proceedings.  Accordingly, defendants' Motion for Summary Judgment is granted, and plaintiff's

Cross-Motion for Summary Judgment is denied.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  May 6, 2021

_____
BERYL A. HOWELL
Chief Judge